**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| LANEY MARIE GRINER and SAM GRINER, | ) |
| | ) |
| *Plaintiffs*, | ) Case No: 1:20-cv-03848-RJL |
| | ) |
| v. | ) |
| | ) Judge Richard J. Leon |
| STEVEN ARNOLD KING, KING FOR | ) United States District Judge |
| CONGRESS, WINRED, INC., and DOES 1-10, | ) District of Columbia |
| | ) |
| *Defendants*. | ) |
| | ) |

## DEFENDANT WINRED'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

Jason Torchinsky (D.C. Bar No. 976033)
Jonathan P. Lienhard (D.C. Bar No. 474253)
HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: (540) 341-8808
Fax: (540) 341-8809

*Counsel for Defendant WinRed, Inc.*

i

## INTRODUCTION

In their original Complaint, Plaintiffs Laney Marie Griner and Sam Griner brought against Defendants Steven Arnold King, King for Congress, and WinRed, Inc. ("WinRed") allegations of copyright infringement, violations of the Digital Millennium Copyright Act (17 U.S.C. § 1202) ("DMCA"), and unauthorized use of likeness. Plaintiffs claim that each of these violations stem from an alleged January 2020 posting of a popular Internet "meme" on Steven King's campaign fundraising page on Facebook.com and WinRed.com to solicit money for his congressional re-election campaign without Plaintiffs' authorization. *See* Dkt. No. 3-1, Compl. ¶¶ 19-40. The meme, titled "Success Kid," features a photograph of Plaintiff Sam Griner that has been shared by "millions of people" worldwide on their social media accounts. *Id.* ¶¶ 14-15.

On March 22, 2021, WinRed filed a motion to dismiss the original Complaint. Dkt. No. 13. In response, Plaintiffs filed a First Amended Complaint ("FAC"), dropping the copyright infringement and DMCA claims against WinRed, while adding some additional factual allegations to support their allegation against WinRed of appropriation of likeness/invasion of privacy. *See* Dkt. No. 16, FAC ¶¶ 25-44; *see also* Dkt. No. 17. WinRed filed a consent motion for a briefing schedule in response to the FAC, which the Court granted. *See* Dkt. Nos. 20-22.

Pursuant to the Court's April 15, 2021 Order, WinRed now respectfully submits the following memorandum of points and authorities in support of its motion to dismiss Plaintiffs' FAC against WinRed under Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. In short, even after amending their Complaint, Plaintiffs' FAC fails (1) to show that this Court can exercise personal jurisdiction over WinRed, and (2) to state a claim against WinRed for misappropriation. Plaintiffs' FAC against WinRed should thus be dismissed with prejudice.

## ARGUMENT

## I.  THIS COURT LACKS PERSONAL JURISDICTION OVER WINRED.

2

When a defendant challenges personal jurisdiction under Rule 12(b)(2), a plaintiff has the burden of proving personal jurisdiction over each defendant. *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). At this stage, the Court must construe all allegations in the light most favorable to Plaintiffs, but bare allegations and conclusory statements are insufficient.

Plaintiffs must allege sufficient facts, rather than conclusory assertions, to support the exercise of personal jurisdiction separately over each defendant.[1] "Before a District of Columbia court may exercise personal jurisdiction over a defendant, plaintiff must allege facts sufficient to show that jurisdiction is appropriate under the District of Columbia long-arm statute and that jurisdiction satisfies the requirements of the Due Process Clause."[2]

Plaintiffs' FAC fails to plead that this Court has personal jurisdiction over any of the Defendants, again failing to even mention Defendant WinRed in its statement of "Jurisdiction and Venue," *see* FAC ¶¶ 1-5, or which theory of personal jurisdiction governs this case, *see id.*. Plaintiffs do allege (upon information and belief) that "Defendant WinRed, Inc. ("WinRed") is a Virginia corporation that does business in the District of Columbia," *id.* ¶ 10, and newly assert in the FAC's description of the parties that

> WinRed regularly transacts business within the District of Columbia, including but not limited to (a) soliciting District of Columbia residents for donations, (b) processing political donations from District of Columbia residents, and (c) processing political donations for District of Columbia political candidates and organizations, including the District of Columbia Republican Party.

*Id.* ¶ 11. For the reasons outlined below, this Court should reject Plaintiffs' assertions in the FAC as inadequate to establish either general or specific personal jurisdiction over WinRed here.

---

[1] *See generally Brit UW, Ltd. v. Manhattan Beachwear, LLC,* 235 F. Supp. 3d 48, 60 n.19 (D.D.C. 2017); *Bazarian Int'l Fin. Assocs. L.L.C. v. Desarrollos Aerohotelco, C.A,* 168 F.Supp.3d 1, 13 (D.D.C. 2016).

[2] *Am. Inst. for Truth in Advert., Inc. v. Vitacommerce, Inc.*, No. 2017 CA 7342 B, 2018 WL 1831864, at *2 (D.C. Super. Ct. Apr. 11, 2018).

3

**A.  This Court Lacks General Personal Jurisdiction Over WinRed.**

WinRed is not domiciled in the District of Columbia. General jurisdiction can be found for nonresident corporations doing business in the District only under D.C. Code §§ 13-334 and 13-422, which essentially require defendant corporations to be either domiciled or served in the District and, as noted below, only then if due process allows it. Under Section 13-422, "[a] District of Columbia court may exercise personal jurisdiction over a person domiciled in, organized under the laws of, or maintaining his or its *principal* place of business in, the District of Columbia as to any claim for relief." *Id.* (emphasis added). However, WinRed is incorporated in *Delaware*, and its principal place of business (and business address) is in Virginia. *See* Exhibit A, Decl. of Gerrit Lansing; *see also* Exhibit B, Delaware Annual Report of WinRed, Inc.[3] Section 13-422 thus forecloses this Court's exercise of general personal jurisdiction in these circumstances. *Cf. BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) (only in an "exceptional case" can "a corporate defendant's operations in another forum [] be so substantial and of such a nature as to render the corporation at home in that State" (cleaned up)); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011) ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place . . . [where] the corporation is fairly regarded at home.").

Thus, even assuming Plaintiffs' newly added allegations in the FAC were true, Plaintiffs cannot rely on principles of general jurisdiction to assert personal jurisdiction over WinRed.

**B.  This Court Lacks Specific Personal Jurisdiction Over WinRed.**

This Court also lacks specific personal jurisdiction over WinRed. Under the District of

---

[3] "In deciding whether to grant a 12(b)(2) motion to dismiss for lack of personal jurisdiction, a court may consider relevant material outside of the pleadings." *Duarte v. Nolan*, 190 F. Supp. 3d 8, 12 (D.D.C. 2016) (internal quotation marks omitted).

4

Columbia's long-arm statute,[4] courts located in the District may exercise personal jurisdiction over any individual who "transact[s] any business in the District of Columbia." D.C. Code § 13-423.[5] District of Columbia courts have interpreted this statute as "provid[ing] jurisdiction to the full extent allowed by the Due Process Clause." *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013). Accordingly, the constitutional and D.C. long-arm jurisdictional questions "merge into a single inquiry: would exercising personal jurisdiction accord with the demands of due process?" *Id.* (internal quotation marks omitted).

Under the Due Process Clause, "specific" or "case-linked" jurisdiction must be based on, and arise from, the intentional acts of the corporation in the forum where jurisdiction is sought. *See Bristol-Myers Squibb Co. v. Superior Court*, 137 S. Ct. 1773, 1779 (2017); *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 330 (D.C. 2000). A corporation's lack of physical presence in a forum will usually defeat specific personal jurisdiction unless the corporation's "efforts are

---

[4] The Federal Rules of Civil Procedure require federal courts in the District of Columbia to look to the District's long-arm statute, D.C. Code § 13-423, to determine the existence of specific personal jurisdiction. *Betz v. Aidnest*, No. 1:18-cv-0292 (KBJ), 2018 U.S. Dist. LEXIS 183632, at *12 (D.D.C. Oct. 26, 2018).

[5] Plaintiffs do not specify which subsection of § 13-423(a) it relies upon to connect WinRed's alleged actions to D.C. That omission is fatal because "[w]hen jurisdiction over a person is based solely upon this section, *only* a claim for relief arising from acts enumerated in this section may be asserted against him." D.C. Code § 13-423(b) (emphasis added). The only potentially applicable subsections are:

> (1) transacting any business in the District of Columbia;
> (2) contracting to supply services in the District of Columbia;
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia;
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if [the defendant] regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia….

D.C. Code § 13-423(a)(1)-(4). As will be shown below, Plaintiffs' allegations are insufficient to satisfy the requirements of this subsection and the Due Process Clause.

5

'purposefully directed' toward residents of [the forum]." *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985). This purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Id.* at 475 (citations and internal quotation marks omitted).

Accordingly, "the defendant's suit-related conduct must create a substantial connection with the forum State. . . . [meaning that] the relationship must arise out of contacts that the defendant himself creates with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). In other words, where the conduct of a defendant that gives rise to the claims occurred elsewhere and not in the forum state, and that conduct was not purposefully directed toward the forum, the forum's courts cannot claim specific jurisdiction over the defendant. *See id.* at 288-90 (Nevada court lacked personal jurisdiction over defendant who "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada"). The "proper lens" is thus to ask "whether the *defendant*'s actions [at issue in the litigation] connect him to the *forum*." *Id.* at 289 (emphasis in original). As alleged in Plaintiffs' Complaint, they do not.

In the context of online tortious actions brought against nonresident defendants, such as WinRed here, this Court has incorporated the "effects test" from *Calder v. Jones*, 465 U.S. 783 (1984) for specific jurisdiction, requiring a defendant's: "(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suffered—and which the defendant knows is likely to be suffered—in the forum state." *See Triple Up Ltd. v. Youku Tudou Inc.*, 235 F. Supp. 3d 15, 29 (D.D.C. 2017) (citation omitted); *Kline v. Williams*, No. 05-01102 (HHK), 2006 U.S. Dist. LEXIS 23263, at *17 (D.D.C. Mar. 17, 2006). Accordingly, "specific jurisdiction in the Internet context may be based only on an out-of-state person's Internet activity directed at [the

6

forum] and causing injury that gives rise to a potential claim cognizable in [the forum]." *ALS Scan, Inc. v. Digit. Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002). As will be shown, such facts have not been pleaded here.

First, the FAC does not make clear what "intentional action" is alleged with respect to WinRed beyond a vague statement that "Defendants willfully infringed Plaintiffs' respective copyright and publicity rights by posting the Photograph . . . ." FAC ¶ 21. What Plaintiffs do allege is joint ownership and operations of a website between King for Congress and WinRed, and that "Defendants" collectively posted Plaintiffs' Photograph on both Facebook.com and WinRed's website to solicit money for King's re-election campaign. *Id.* ¶¶ 20-21. However, due process requires more than conclusory allegations that group WinRed together with the other Defendants as though they were all one actor, without further explanation.

Second, regarding whether the alleged actions were "expressly aimed at the forum state," Plaintiffs' FAC does include a new vague allegation that WinRed "solicit[s] District of Columbia residents for donations," *id.* ¶ 11, perhaps in an effort to satisfy the express aiming requirement. To the contrary, WinRed's activities are not expressly aimed at D.C. because

> WinRed's only interaction with the District of Columbia is when its website functions as an online conduit between donors located in the District and recipient committees (similar to any other state where donors contribute via WinRed's online platform), or when donations are 'conduited' via WinRed's website to recipient committees based in the District. These contacts are no different from WinRed's contacts with all other states throughout the country. WinRed does not specifically target or direct its online services toward the District in any way.

*see* Exhibit A, Lansing Decl. ¶ 12. Even assuming the truth of Plaintiffs' allegation here, the FAC still fails to allege whether or how WinRed expressly aimed the solicitation at issue here at D.C., as opposed to any other jurisdiction. Plaintiffs' misappropriation action against WinRed thus also fails under the second *Calder* factor.

Third, and most crucial, the FAC fails to allege that the "*brunt* of [the harm]" from infringement was suffered in the District of Columbia, or indeed, that any unique harm was suffered in the District, as Plaintiffs reside in Jacksonville, Florida. FAC ¶¶ 6-7. Equally problematic, Plaintiffs fail to allege that WinRed (or any defendant) knew that harm would likely be suffered *in D.C.*, which they were also required to do. *See Triple Up Ltd.*, 235 F. Supp. 3d at 29. To the extent Plaintiffs assert that WinRed knew that the harm from the alleged tortious activity taking place on its website would likely be suffered in D.C. because individuals in D.C. would access and view the photograph online, the same could be said for every other jurisdiction throughout the country with Internet access. The facts as pleaded here are thus insufficient to satisfy due process because they fail to allege that WinRed "select[ed] or knowingly transmit[ted] infringing photographs *specifically to* [the District] with the intent of engaging in business or any other transaction in [the District]. Rather, its role as an [online service provider] was at most passive." *ALS Scan, Inc.*, 293 F.3d at 714-15 (emphasis added). Plaintiffs' allegations against WinRed fail to satisfy *Calder*'s "effects test" for establishing personal jurisdiction.

Instead, Plaintiffs' allegations here appear to boil down to a simple basis for jurisdiction: WinRed transacts business with residents of the District of Columbia, FAC ¶ 11, including Steven King and King for Congress, and King for Congress's principal place of business is in the District of Columbia, *id.* ¶ 5. However, transacting business with a corporation that is domiciled in D.C. does not, by itself, result in personal jurisdiction through osmosis or indeed, under the D.C. Code. Nor does a D.C.-based political committee's (or candidate's) mere acceptance of WinRed's online terms of service to create an individualized webpage on WinRed, *see* Exhibit C; *see also* Exhibit A, Lansing Decl. ¶¶ 15-17, come anywhere close to creating the "substantial connection," *Burger King*, 471 U.S. at 475 n.18, between WinRed and the District necessary to support specific

jurisdiction over the infringement actions alleged here.[6]

Permitting the exercise of specific personal jurisdiction in this situation would mean online service providers across the country lacking meaningful contacts with numerous jurisdictions could be brought into any court merely because their services are open and accessible to users in those jurisdictions. *Cf. World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980). The Due Process Clause does not permit such an expansive interpretation of specific jurisdiction for online service providers. "Not all material placed on the Internet is, solely by virtue of its universal accessibility, expressly aimed at every [forum] in which it is accessed." *AMA Multimedia, Ltd. Liab. Co. v. Wanat*, 970 F.3d 1201, 1211 (9th Cir. 2020) (citation omitted). Accordingly, operating "a passive website alone cannot satisfy the express aiming prong" without something more. *Id.* (citation omitted). Instead, minimum contacts from tortious Internet activity are only created "where the defendant conducts this [online] activity with the knowledge that such harm will be *particularly felt* in the forum state." *Kline*, 2006 U.S. Dist. LEXIS 23263, at *18 (emphasis added).

In short, Plaintiffs' FAC fails to allege the necessary purposeful direction, express aiming,

---

[6] In general, commercial activities do not satisfy the D.C. long-arm statute's "transacting any business" provision unless the activities were "*directly related* to the transaction of business" within the District. *West v. Holder*, 60 F. Supp. 3d 190, 195 (D.D.C. 2014) (emphasis added); *see also Brunson v. Kalil & Co.*, 404 F. Supp. 2d 221, 234 (D.D.C. 2005) (holding that a defendant's communications with a company in the District for the purpose of receiving a commission did not constitute "transacting any business" under the statute because "[t]he contact arose out [of] a desire to be paid services rendered, not out of any desire to do business in the District of Columbia"); *Cellutech, Inc. v. Centennial Cellular Corp.*, 871 F. Supp. 46, 49-50 (D.D.C. 1994) (holding that negotiations conducted by mail and wire into the District concerning a contract that would be performed outside of the District were insufficient to establish jurisdiction under D.C.'s long-arm statute).

Here, by contrast, no allegation has been made that Defendants' alleged tortious conduct of posting Plaintiffs' Photograph on WinRed's website resulted in any way from WinRed's "desire to do [or transact] business in the District of Columbia," *cf. Brunson*, 404 F. Supp. 2d at 234. Instead, Plaintiffs appear to allege that jurisdiction is proper merely because a committee that is allegedly located in the District previously entered into a contract with WinRed by accepting its online terms of use. This is insufficient to establish purposeful direction on the part of WinRed.

9

or harm experienced in this forum and therefore falls far short of meeting *Calder*'s effects test. This Court's holding in *Kline v. Williams* is directly on point here, where it held that a Maryland-based plaintiff had not

> established any link between [plaintiff] and the District [i.e., the forum] which would reasonably give notice to defendants that the injury resulting from their online activities would occur within the District. To the contrary, [plaintiff] states that she is a resident of the state of Maryland. Absent additional information it would seem *a more reasonable inference that the brunt of harm would be felt in Maryland* and not in the District. [Plaintiff] has not claimed to work in the District, to have any close connections with the District, or even to regularly visit the District. This court thus sees no basis on which to infer that defendants expressly aimed their actions at this forum.

2006 U.S. Dist. LEXIS 23263, at *19 (emphasis added). The same is true here.

Because WinRed is not domiciled in the District, its alleged suit-related contacts with the District are entirely attenuated, rather than extensive or substantial, and were not purposefully directed at the District, *see* Exhibit A, Lansing Decl. ¶¶ 9-12, and because the brunt of the alleged harm was not suffered in D.C. (much less did WinRed know that the alleged harm was likely to be suffered in D.C.), this Court lacks personal jurisdiction over WinRed. Plaintiffs' action against WinRed should therefore be dismissed.

## II.   PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST WINRED.

Even assuming this Court has jurisdiction over this action against Defendant WinRed, Plaintiffs' FAC should still be dismissed under Rule 12(b)(6) because they have failed to state a claim against WinRed for invasion of privacy through unauthorized use of likeness.

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." While "detailed factual allegations" are not required, Rule 8 does require "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To wit, "[t]hreadbare recitals of the elements of a

10

cause of action, supported by mere conclusory statements, do not suffice" to state a claim for relief. *Id.* "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

A complaint's factual allegations must thus "be enough to raise a right to relief above the speculative level, that is, the pleading must contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action." *Merideth v. Chi. Tribune Co., LLC*, No. 12 C 7961, 2014 U.S. Dist. LEXIS 2346, at *5 (N.D. Ill. Jan. 9, 2014). While these allegations must be viewed in the light most favorable to the plaintiff, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation" if that conclusion cannot reasonably be drawn from the facts as alleged. *Twombly*, 550 U.S. at 555. Thus, a plaintiff's "[c]onclusory allegations without more" are insufficient to defeat a Rule 12(b)(6) motion. *Jacobsen v. Katzer*, 609 F. Supp. 2d 925, 932 (N.D. Cal. 2009) (citation omitted).

Furthermore, beyond alleging conduct that is just *conceivable*, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). A court's determination of whether a claim has facial plausibility is ultimately "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

In their original Complaint, Plaintiffs brought allegations of copyright infringement and violations of Section 1202 of the DMCA against WinRed, in addition to a claim of invasion of

privacy through appropriation of likeness. Dkt. No. 3-1, Compl. ¶¶ 23-40. Plaintiffs have since

dropped these first two claims against WinRed in their FAC after WinRed filed its first motion to

dismiss. *See* Dkt. No. 16, FAC at 7-10.[7] Plaintiffs' FAC provides more description of WinRed's

activities regarding the third claim than in their original Complaint, adding that the Website where

Sam Griner's image was posted "was maintained by Winred," *id.* ¶ 39, and that WinRed and the

other Defendants "received money from the Website advertisement that featured Sam's likeness,"

*id.* ¶ 40. Yet despite these modifications, the FAC still suffers from the same deficient, threadbare

recitals of factual allegations against WinRed that existed in the original complaint, failing again

to define WinRed's role in the alleged tortious activity. *See* Dkt. No. 13-1.

   For instance, Plaintiffs fail to specifically state which of the "Defendants" posted the image

on "the Website" allegedly maintained by WinRed, or even whether WinRed was involved in

posting the picture at all. *See* FAC ¶ 39. Nor do Plaintiffs clarify whether they are alleging that

WinRed directly misappropriated the image in concert with the other Defendants, or only played

a secondary role in aiding or encouraging the tortious conduct. If Plaintiffs intended to assert the

former, no facts are alleged that would support such direct involvement. *See id.* ¶¶ 20-24. And if

Plaintiffs intended to assert that WinRed is secondarily liable for the alleged tortious activity, they

also fail to plead the requisite knowledge and involvement for such liability—as explained further

below, bare allegations of passively operating a website on which Mr. Griner's image was posted

by other Defendants, *see id.* ¶ 39, and receiving money from transactions resulting from other

Defendants posting the photograph on that website, *see id.* ¶¶ 10, 24, and 40, are inadequate to

state a claim for secondary or contributory liability under D.C. law. Because the FAC's sparsely

---

[7] Should the Court determine that either of these first two claims are still raised against Defendant
WinRed in Plaintiffs' FAC, WinRed incorporates by reference its arguments from its March 22,
2021 Memorandum in Support of its Motion to Dismiss. *See* Dkt. No. 13-1, Mem. in Supp. of
WinRed's Mot. to Dismiss.

pleaded factual content does not enable the Court to draw a reasonable inference that WinRed is liable for misappropriation, Plaintiffs fail to plead a facially plausible claim. *See Iqbal*, 556 U.S. at 678.

Moreover, Plaintiffs' claims also fail because they do not allege any "public interest or other value" to WinRed in using the image as they were required to do, *see Vassiliades v. Garfinckel's*, 492 A.2d 580, 592 (D.C. 1985) (citing Restatement (Second) of Torts § 652C, cmt. c), or any facts showing that WinRed's alleged use of Sam Griner's image in the online advertisement was non-incidental to his name or reputation. Finally, this D.C. common law tort claim based on alleged third-party activity and content posted on WinRed's website is preempted by Section 230 of the Communications Decency Act ("CDA"). *See* 47 U.S.C. § 230.

Accordingly, even after amending their Complaint, Plaintiffs still fail to satisfy their Rule 8 pleading threshold regarding their invasion of privacy allegation against WinRed. This action against WinRed should thus be dismissed with prejudice.

## A. Plaintiffs Fail to State a Claim Against WinRed for Appropriation of Likeness Under D.C. Law.

In the District of Columbia, appropriation of likeness (often used interchangeably with "misappropriation of the right of publicity," *see Parker v. Google, Inc.*, 422 F. Supp. 2d 492, 501 (E.D. Pa. 2006)) is a common law tort that falls under the broader umbrella of "invasion of privacy." *Tripp v. United States*, 257 F. Supp. 2d 37, 40-41 (D.D.C. 2003). D.C. courts have traditionally applied the definition of "appropriation of name or likeness" found in Section 652C of the Restatement (Second) of Torts. *Id.* Under this definition, the tort of appropriation of likeness consists of two basic elements: (1) defendant makes use of plaintiff's name or likeness (2) for his own purposes and benefit. *See* Restatement (Second) of Torts § 652C cmt. b (Am. L. Inst. 1975).

A defendant generally may be found liable for tortious misappropriation on either a direct

or secondary theory of liability. *See Wultz v. Islamic Republic of Iran*, 755 F. Supp. 2d 1, 55 (D.D.C. 2010) ("[O]rdinary tort-law principles . . . include secondary liability." (citing Restatement (Second) of Torts § 876)). Section 876 of the Restatement (Second) of Torts, which has been cited approvingly in this Circuit, *id.* at 55-57; *see also Halberstam v. Welch*, 705 F.2d 472, 478-79 (D.C. Cir. 1983) (affirming district court's imposition of liability for concerted tortious actions by secondary defendant through conspiracy and aiding-abetting), provides that one is jointly liable for harm to a third party from the tortious conduct of another if he:

a) does a tortious act *in concert with* the other in pursuit to a common design with him, or
b) *knows* that the other's conduct constitutes a breach of duty and gives *substantial assistance or encouragement* so to conduct himself, or
c) gives substantial assistance to the other in accomplishing a tortious result and his *own conduct,* separately considered, *constitutes a breach of duty* to the third person.

Restatement (Second) of Torts § 876 (emphasis added); *see generally Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1183 (C.D. Cal. 2002) (applying Section 876 of the Restatement in determining liability for "right of publicity torts" like appropriation of likeness).

Plaintiffs' FAC lacks factual allegations that WinRed participated in the alleged misappropriation of Mr. Griner's image here, whether in a primary or secondary role. Plaintiffs' failure to plead whether WinRed is liable for direct or secondary misappropriation alone merits dismissal of the FAC against WinRed because it fails to "provide the grounds of [Plaintiffs'] entitle[ment] to relief," *Twombly*, 550 U.S. at 555 (internal quotation marks omitted), under D.C. law. Dismissal with prejudice is appropriate because Plaintiffs fail to clarify their factual allegations even after taking the opportunity to amend their original Complaint.

Furthermore, under either theory of liability, because the FAC does not allege that Defendants' use of Mr. Griner's image in the online advertisement was non-incidental to his name or reputation, Plaintiffs do not state a claim of misappropriation by WinRed.

14

### 1. The FAC lacks factual allegations that WinRed is liable for direct misappropriation.

"One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." Restatement (Second) of Torts § 652C. Besides failing to clarify whether WinRed was directly or secondarily liable for misappropriation of Sam Griner's likeness, Plaintiffs' FAC is bereft of factual allegations capable of showing that WinRed played a direct or active role in the alleged misappropriation.

The FAC alleges that "[i]n or about January 2020, Defendants willfully infringed Plaintiffs' . . . publicity rights by posting the Photograph, without Plaintiffs' knowledge or consent, on *inter alia* King's campaign fundraising page on Facebook.com and on WinRed[8] for the express purpose of soliciting money for King's congressional re-election campaign." FAC ¶ 21. However, none of Plaintiffs' factual allegations support that WinRed's own conduct (separate from the other Defendants' alleged actions) would constitute misappropriation. *See* Restatement (Second) of Torts § 876(c). Regarding WinRed's involvement in particular, Plaintiffs merely allege that the Website where Sam Griner's image was posted "was maintained by Winred," *id.* ¶ 39, and that WinRed "received money from the Website advertisement that featured Sam's likeness," *id.* ¶ 40.

---

[8] Perplexingly, even though Plaintiffs allege in FAC paragraph 21 that the photos were posted "on WinRed," they also assert without support that "King for Congress and WinRed jointly own and operate a website at www.steveking.com" which they refer to as "the Website" throughout the FAC, *see* FAC ¶ 20, and which they allege "was maintained by Winred," *id.* ¶ 39. However, a cursory glance at www.steveking.com (a publicly available website) reveals that it is an entirely separate website from the website operated by WinRed and WRTS, *i.e.*, www.winred.com (also publicly accessible). *See generally Turpin v. Ray*, Civil Action No. 19-2394 (RC), 2020 U.S. Dist. LEXIS 54844, at *12 n.6 (D.D.C. Mar. 30, 2020) ("[T]he Court takes judicial notice of . . . publicly-available materials without converting Defendants' motion to dismiss into one for summary judgment."). The FAC implicitly acknowledges this point by describing "the Website," www.steveking.com, as a separate and distinct website from "Winred.com." *See id.* ¶ 24. While it can perhaps be assumed that Plaintiffs accidentally conflate the King for Congress campaign website with WinRed's separate fundraising landing page, their erroneous assertion (if anything) only bolsters the case for dismissal because WinRed has no ownership or involvement in operating www.steveking.com and the activities taking place on that platform.

Plaintiffs' assertion that "Defendants" collectively posted the photograph is vague and conclusory with respect to WinRed because it does not describe the roles of each Defendant in carrying out the alleged tort. Without additional explanation or factual support for WinRed's role in the alleged misappropriation, these conclusory allegations are inadequate to show WinRed's direct involvement in the tort.

Instead, these statements amount to nothing more than an unadorned accusation against WinRed that recites "the elements of a cause of action, supported by mere conclusory statements," *Iqbal*, 556 U.S. at 678. WinRed's maintenance of a passive website where tortious activity is allegedly engaged in entirely by third-party users, without more, is not enough to state a claim for direct misappropriation. *Cf. VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731-32 (9th Cir. 2019) ("To demonstrate volitional conduct" by a website accused of infringement, plaintiffs "must provide some evidence showing [the alleged infringer] exercised control (other than by general operation of [its website]); selected any material for upload, download, transmission, or storage; or instigated any copying, storage, or distribution of [the] photos.").

Regarding the factual allegation that WinRed received money from the advertisement, "it is not enough to demonstrate that defendant profited directly from unauthorized use of the plaintiff's photograph" to state a claim for misappropriation. *Tripp*, 257 F. Supp. 2d at 43 (citation omitted). Otherwise, all websites that charge processing fees to their users would be automatically subject to liability for similar torts allegedly committed on their websites merely because they profited directly from the infringing activities. Accordingly, Plaintiffs' factual allegation that WinRed received money from an advertisement featuring Mr. Griner's likeness is also inadequate to state a claim of direct misappropriation.

**2. The FAC lacks factual allegations that WinRed is liable for secondary misappropriation.**

D.C. Circuit precedent provides for two theories of secondary tort liability: liability for those who conspire to commit a tortious act with a direct tortfeasor, or for those who aid and abet a tortfeasor while knowing that that person's conduct is tortious. Restatement (Second) of Torts § 876. Plaintiffs have failed to plead facts sufficient to show WinRed's liability for secondary misappropriation under either of these theories.

Specifically, under D.C. law, liability for civil conspiracy requires:

(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.

*Halberstam*, 705 F.2d at 478. The FAC does not allege any facts showing an agreement or scheme between WinRed and the other Defendants to commit an unlawful act. The FAC thus does not state a claim against WinRed for secondary misappropriation via civil conspiracy.

Regarding aiding and abetting, the D.C. Circuit noted that "[a]dvice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance." *Id*. (relying on Restatement Section 876 to explain aiding-abetting liability under D.C. law); *see also Wultz*, 755 F. Supp. 2d at 57 (same for this Court). Civil liability for aiding and abetting under D.C. law includes the following elements:

(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant must knowingly and substantially assist the principal violation.

*Halberstam*, 705 F.2d at 478-79. Besides failing to allege that WinRed *substantially* assisted the other Defendants in a tortious act, the FAC also fails to allege that WinRed had knowledge that the photograph was posted at all, much less knowledge that misappropriation had taken place. For

17

instance, no facts are alleged that WinRed was ever notified of either the photograph's existence or its allegedly tortious nature. This alone is fatal to a potential claim of secondary liability by means of aiding and abetting. *Cf. Hart v. World Wrestling Entm't, Inc.*, No. 3:10cv0975 (SRU), 2012 U.S. Dist. LEXIS 43184, at *23 (D. Conn. Mar. 28, 2012) (dismissing plaintiff's invasion of privacy and right of publicity tort claims because plaintiff failed to allege that defendant "had knowledge that [the allegedly tortious video] contained [plaintiff's] photo" even though defendant allegedly personally participated in the decision to release the video). Nor is Plaintiffs' conclusory, boilerplate language that "each of the Defendants" had "full knowledge of all the facts and circumstances . . . [including] full knowledge of each and every violation of Plaintiff's rights and damages to Plaintiff proximately caused thereby," FAC ¶ 13, sufficient to allege knowledge on the part of WinRed in particular. Absent more specific factual allegations of WinRed's knowledge, these "boilerplate allegations . . . are not sufficient to state a claim for relief," *Roberts v. U.S. Dep't of Justice*, 366 F. Supp. 2d 13, 26 (D.D.C. 2005).

   Also problematic for Plaintiffs is the fact that users of WinRed's website are required to enter into an end user agreement that they will not use the WinRed website to engage in any tortious conduct, expressly prohibiting uploading or posting any material that "violates the privacy/publicity of any other individual or entity."[9] Given this end user agreement, it would not

---

[9] WinRed requests the Court take judicial notice of language from its end user license agreement that all users of WinRed's platform must electronically agree to prior to using WinRed's platform to create contribution pages. Because this is "publicly available" on WinRed's public website and is attached to WinRed's motion to dismiss here as Exhibit C, the Court may take judicial notice of it for purposes of WinRed's motion to dismiss. End User Terms of Use, *available at* https://winred.com/terms/donor-terms/; *cf. Deripaska v. AP*, 282 F. Supp. 3d 133, 140 (D.D.C. 2017); *Univ. of Colo. Health at Mem'l Hosp. v. Azar*, Civil Action No. 14-1220 (RC), 2020 U.S. Dist. LEXIS 58625, at *65 (D.D.C. Mar. 31, 2020) ("The Court agrees . . . that parties may cite to publicly available documents and that the Court may take judicial notice of such documents.") (taking judicial notice of such documents in deciding a motion to dismiss); *Turpin*, 2020 U.S. Dist. LEXIS 54844, at *12 n.6 ("[T]he Court takes judicial notice of them as publicly-

be unreasonable for WinRed to assume that its users comply with this contract by "first obtaining the permission of the owner of such rights," Exhibit C. Thus, even if Plaintiffs had alleged WinRed knew of the photo's presence on www.winred.com (which they have not), this would still be insufficient by itself to plead that WinRed had knowledge and awareness of the other Defendants' tortious activity. Thus, the FAC also falls far short of pleading that WinRed is liable for aiding and

_____

available materials without converting Defendants' motion to dismiss into one for summary judgment.").

WinRed's terms of use include an agreement by committee users that they will not "upload, post, reproduce, or distribute any information, software, or other material protected by copyright or any other intellectual property right (as well as rights of publicity and privacy) without first obtaining the permission of the owner of such rights." Exhibit C.

Committee users of WinRed further agree they will not "post any content that is unlawful, harmful, tortious, . . . invasive of the privacy of another person, . . . infringing, . . . [or that] violates the privacy publicity of any other individual or entity," and by posting any content on or through the Platform, a committee "represent[s] and warrant[s] that [it] own[s] the content submitted, displayed, published or posted" on the Platform and "otherwise ha[s] the right to grant the license set forth herein," and that **"*the displaying, publishing or posting of any content [it] submit[s], and our use thereof does not and will not violate the privacy rights, publicity rights*, . . . or other rights of any person or entity." *Id.* (emphasis added).

Finally, users agree to "indemnify and hold TS, WinRed Inc. ("WinRed"), and their parents, subsidiaries, officers, employees, and website contractors and each of their officers, employees and agents ("Indemnified Parties") harmless from any claims, damages and expenses, including reasonable attorneys' fees and costs, related to [its] violation of these Terms, including the Posting Policy, or any violations thereof by [its] dependents or which arises from the use of User Content [it] submitted, posted, or otherwise provided to TS or this Platform," and that "TS assumes no liability for any information removed from our Platform, and reserves the right to permanently restrict access to the Platform or a user account." *Id.*

The terms of this end user agreement further bolster WinRed's argument that it should not be held liable for tortious materials posted on its website by its users without its knowledge. *See Forrest v. Verizon Commc'ns., Inc.*, 805 A.2d 1007, 1010-11 (D.C. 2002) (holding that an online "clickwrap agreement" was enforceable and that adequate notice was provided of agreement terms where users had to click "Accept" to agree to the terms in order to subscribe); *A.V. v. iParadigms, LLC*, 544 F. Supp. 2d 473, 480 (E.D. Va. 2008) *rev'd in part on other grounds, A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630 (4th Cir. 2009) ("Because a limitation of liability clause was among the terms of the Agreement, the Court finds that [defendant] cannot be held liable for any damages arising out of Plaintiffs' use of the [] web site.").

19

abetting misappropriation.

While the FAC appears to assert that one's mere ownership, maintenance, and profiting from a website is sufficient to show liability for any tortious activities that take place on that platform, D.C. law requires allegations of more substantial participation, knowledge, and awareness than that. Because Plaintiffs fail to plead any of these requisite facts, the FAC should be dismissed.

### 3. Under either theory of liability, the FAC fails to plead non-incidental use of Sam Griner's image by Defendants.

Despite the apparent simplicity of the Restatement's formulation of the appropriation of likeness tort, its definition does not mean that *any* use of an individual's likeness without their consent constitutes a tort, even in cases in which the defendant derives a benefit from the challenged use. *See* Restatement (Second) of Torts § 652C. After all, "[n]o one has the right to object merely because his name or his appearance is brought before the public, since neither is in any way a private matter and both are open to public observation." *Id.* at cmt. d. The comments to Section 652C explain that appropriation of likeness does *not* occur when a person's likeness "is published for purposes other than taking advantage of his reputation, prestige, or other value associated with him, for purposes of publicity." *Id.* When a plaintiff has failed to plead facts sufficient to establish that the defendant's purpose in publishing his likeness was to capitalize on its "value," then the plaintiff cannot recover under an appropriation of likeness theory. *See Tripp*, 257 F. Supp. 2d at 42.

In a seminal D.C. Court of Appeals case, a plaintiff alleged that her plastic surgeon appropriated her likeness for commercial gain when he used "before" and "after" photos of her cosmetic surgery in a public presentation. *See Vassiliades*, 492 A.2d at 584. Plaintiff's appropriation of likeness claim was denied by the court even though the defendant had used

20

photographs of plaintiff for his benefit because the plaintiff "ha[d] not shown there was a public interest or other value in her likeness." *Id.* at 592. The essential question is *why* the defendant utilized the plaintiff's likeness because many uses of another individual's likeness—including uses from which a defendant benefits in some manner—are permissible. If the defendant's use was merely incidental, meaning "for a purpose other than taking advantage of a person's reputation or the value associated with his name," then such use "will not result in actionable appropriation." *Id.* This case presents a scenario of incidental use.

In order to survive a motion to dismiss, a plaintiff claiming appropriation of likeness must allege "that some benefit was derived through defendant's 'use' of plaintiff's name, and that the 'use' was not 'incidental.'" *Tripp*, 257 F. Supp. 2d at 40. However, even if WinRed was the entity that posted or shared Plaintiff's likeness, and even if it benefited from that use, Plaintiff has still failed to allege sufficient facts to establish a claim for appropriation of likeness because Plaintiff has failed to allege that WinRed's use "was not 'incidental.'" *Id.* Incidental use of likeness is not synonymous with tortious appropriation of likeness, and Plaintiffs have failed to allege any facts that establish that a non-incidental appropriation has occurred.

Plaintiffs allege that King for Congress shared a popular image of an infant, Plaintiff Sam Griner, on its Facebook page and on WinRed accompanied by the text "Fund Our Memes!!!". *See* FAC ¶ 21. This is essentially all that Plaintiffs allege to show unauthorized use of likeness. This allegation, in and of itself, fails to establish that Defendants' use of the photograph was sufficiently non-incidental to establish a cause of action. In other cases in D.C. courts where a plaintiff made only conclusory allegations based on a defendant's use of their likeness, the plaintiff failed to recover under an appropriation of likeness theory. *See, e.g.*, *Vassiliades*, 492 A.2d at 592; *Budik v. Howard Univ. Hosp.*, 986 F. Supp. 2d 1, 12 (D.D.C. 2013) ("Even construed liberally, the

complaint here includes only conclusory allegations concerning the public interest in or value to the defendant of the plaintiff's likeness and name."). Plaintiffs' allegations are similarly conclusory because they allege only that the image was shared by an individual whose political beliefs they find objectionable.

It is not clear from the face of Plaintiffs' FAC what value the use of Sam Griner's likeness allegedly conferred on WinRed. The alleged Facebook post makes no reference to Sam Griner's identity beyond the image itself, and the added text and accompanying message are completely unconnected to the individual depicted in the photo. *See* FAC ¶ 21. And contrary to Plaintiffs' allegations that they were harmed by an implicit association of Mr. Griner with Rep. King's political views, there is nothing about the alleged use of the image that would indicate that Mr. Griner supports King's views, that King was implying such an endorsement, or even that King for Congress (or anyone associated with King) was aware of the identity of the individual in the image. As Plaintiffs correctly note, Mr. Griner's image has become a popular Internet meme that has been shared online by "millions of people," generally without such accompanying harm to Plaintiffs, *see id.* ¶ 15, and entirely incidental to Sam Griner's reputation or name. That is precisely what happened here. The use of Plaintiff's likeness was incidental to the message conveyed, and a mere allegation of use without an accompanying demonstration of the "'value' associated with mention or use of the plaintiff's … likeness" is insufficient to state a claim for relief. *Tripp*, 257 F. Supp. 2d at 42.

Under either theory of liability, Plaintiffs fall short of stating a claim of invasion of privacy/unauthorized use of likeness against WinRed. Dismissal of the FAC with prejudice is thus warranted.

**B. As Now Alleged, Section 230 of the Communications Decency Act Preempts This Common Law Tort Claim Against WinRed.**

Section 230 of the CDA protects online service providers ("OSPs") from liability based on third-party users' content on OSPs' websites. The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It also contains a preemption provision that expressly extends immunity to "[s]tate or local law" claims "inconsistent with this section." *Id.* § 230(e)(3).

In passing the CDA, Congress "recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium. The imposition of tort liability on service providers for the communications of others represented, for Congress, simply another form of intrusive government regulation of speech." *Blumenthal v. Drudge*, 992 F. Supp. 44, 50 (D.D.C. 1998) (quoting *Zeran v. America Online, Inc.*, 129 F.3d 327, 330-31 (4th Cir. 1997) (Wilkinson, J.)). Accordingly, "lawsuits seeking to hold [interactive computer services like Facebook or YouTube] liable for [their] exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred." *Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 105 (D.D.C. 2016) (quoting *Zeran*, 129 F.3d at 330).

"Preemption under the Communications Decency Act is an affirmative defense, but it can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007); *Jones v. Horne*, 634 F.3d 588, 600 (D.C. Cir. 2011)). This Court "must therefore grant [a] defendant's motion to dismiss" on CDA grounds "if it answers three questions in the affirmative:

> (1) whether the defendants are "provider[s] . . . of an interactive computer service," 47 U.S.C. § 230(c)(1); (2) whether the plaintiff seeks to treat the defendants as "publisher[s] or speaker[s] of any information provided," *id.*; and (3) whether the information at issue

23

was published "by another information content provider," *id. See Parisi v. Sinclair*, 774 F. Supp. 2d 310, 315-16 (D.D.C. 2011) (citing *Nemet Chevrolet, Ltd., v. Consumeraffairs.com, Inc.*, 564 F. Supp. 2d 544, 548 (E.D. Va. 2008), *aff'd*, 591 F.3d 250 (4th Cir. 2009)).

*Klayman v. Zuckerberg*, 910 F. Supp. 2d 314, 318 (D.D.C. 2012). Thus, even if this Court determines that Plaintiffs have pled facts sufficient to state a prima facie misappropriation claim against WinRed, this claim is preempted by Section 230 of the CDA because WinRed through its technology vendor WinRed Technical Services ("WRTS") (1) provides an "interactive computer service," *see* 47 U.S.C. § 230(c)(1), for donors and recipients on WinRed's website, (2) makes decisions whether to exclude material that third parties seek to post on its website, and (3) merely operates as a fundraising platform where third parties (such as the other Defendants here) post content of their own independent choosing. Furthermore, the language of the CDA, Congressional intent, and recent caselaw developments demonstrate that the CDA's carveout for intellectual property only extends to *federal* intellectual property claims. Dismissal of this D.C. common law claim is necessary because it is now clear from the new and crystallized allegations of the FAC that it is barred by Section 230.

### 1. WinRed's website provides an "interactive computer service."

"Where a defendant's website gives its users the ability to create, upload, and share various types of information, the defendant provides or enables computer access by multiple users to a computer server under 47 U.S.C. § 230(f)(1), and is therefore [an] interactive computer service provider[]." *Klayman*, 910 F. Supp. 2d at 318 (cleaned up), *aff'd*, 753 F.3d at 1357. Accordingly, this Court has determined that websites generally qualify as "interactive computer service" providers. *Id.* (referencing cases from the First, Fourth, and Ninth Circuits for the same proposition). Such interactive computer service providers cannot "be treated as a 'publisher or speaker' and therefore may not be held liable in tort." *Blumenthal*, 992 F. Supp. at 50.

24

As is readily apparent from WinRed's publicly accessible website, www.winred.com, and even from the face of Plaintiffs' complaint, WinRed provides users (i.e., political committees and donors) the ability to create, upload, and share various types of information on the website to facilitate fundraising and processing of political donations, and enables them to "gain access to information stored" on WinRed's servers, *Klayman*, 753 F.3d at 1357. Because websites generally qualify as interactive computer services, WinRed's website clearly qualifies as an interactive computer service, meeting the first prong of the test for immunity under Section 230.

   **2. Plaintiffs seek to treat WinRed as a publisher of Sam Griner's photograph on WinRed's website.**

Although the D.C. Circuit "has not examined the definition of the word 'publisher' within the meaning of the CDA, other courts have construed the term as referring to one who 'review[s], edit[s], and decid[es] whether to publish or to withdraw from publication third-party content.'" *Klayman*, 910 F. Supp. 2d at 319 (quoting *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009)); *see also Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003) (describing decisions "whether to publish, withdraw, postpone, or alter content" as falling within "a publisher's traditional editorial functions"); *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008) (no liability under the CDA for "decisions relating to the monitoring, screening, and deletion of content" by an interactive computer service provider). Thus, "any activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Klayman*, 753 F.3d at 1359 (quoting *Fair Hous. Council v. Roommates.com, LLC*, 521 F.3d 1157, 1170-71 (9th Cir. 2008) (en banc)).

Should this Court determine that the FAC contains sufficient factual allegations that WinRed is secondarily liable for misappropriating Mr. Griner's image, it would necessarily follow that Plaintiffs have claimed that WinRed should be held liable for the alleged publication of, or

failure to withdraw from publication, Mr. Griner's photograph from the website. This attempt to hold WinRed liable for its exercise of these traditional editorial functions over third-party content posted on its website falls squarely within the ambit of activities protected by Section 230.

3. **Because WinRed merely provides an online fundraising platform where third parties can post their own independent content, any posting of a photograph misappropriating Sam Griner's likeness would have been posted by an information content provider other than WinRed.**

"[A] website does not create or develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online." *Klayman*, 753 F.3d at 1358. Such websites that provide neutral tools for its third-party users are immune under Section 230(c)(1) from liability for torts committed by those users. By contrast, Section 230 does "not immunize [a defendant] with respect to any information [a defendant] developed or created entirely by itself, and [] there are situations in which there may be two or more information content providers responsible for material disseminated on the Internet." *Blumenthal*, 992 F. Supp. at 50; *compare, e.g.*, *Roommates.com*, 521 F.3d at 1166 (en banc) (housing website that required users to disclose their sex, family status, and sexual orientation, in violation of federal housing law, was not entitled to CDA protection), *with Nemet Chevrolet*, 591 F.3d at 257 (website that did not "contribute[] to the allegedly fraudulent nature of the comments at issue" was protected by the CDA). Section 230 thus "does not preclude joint liability for the joint development of content." *Blumenthal*, 992 F. Supp. at 50.

Accordingly, this Court has adopted the approach of the Ninth Circuit, Fourth Circuit, and the *Blumenthal* Court in framing the third prong of the Section 230 test: "the relevant question [is] whether a defendant function[s] as an 'information content provider' for the portion of the . . . publication at issue." *Klayman*, 910 F. Supp. 2d at 320-21 (internal quotation marks omitted). In conducting this inquiry, this Court has noted that "development of content is not merely . . .

26

augmenting the content generally, but . . . *materially contributing* to its alleged unlawfulness."
*Baldino's Lock & Key Serv. v. Google LLC*, 285 F. Supp. 3d 276, 282 (D.D.C. 2018) (quoting
*Roommates.com*, 521 F.3d at 1167-68) (emphasis added).

Because Plaintiffs' FAC never alleges whether or how WinRed functioned as an
information content provider for the publication at issue here, *i.e.*, the alleged tortious posting of
Mr. Griner's photograph, much less how WinRed materially contributed to the alleged
unlawfulness, but instead describes WinRed's operation and maintenance of a website that
provides fundraising services for third party users, *see* FAC ¶¶ 10-11, this prong is also satisfied.
Specifically, its new description of WinRed's involvement in the alleged tort in the FAC is that
WinRed allegedly maintains the website on which Sam's photograph was posted, *id.* ¶ 39, and that
WinRed "received money from donations made in response to Defendants' unauthorized posting
of the Subject Photo . . . on Winred.com," *id.* ¶ 24, because WinRed "keeps 3.8% of each dollar it
raises online, in addition to a per-contribution processing fee," *id.* ¶ 10.[10] Thus, rather than alleging
creation or development of content by WinRed on Winred.com, the FAC instead merely describes
"a neutral means by which third parties can post information of their own independent choosing

---

[10] These allegations are analogous to those brought in *Klayman*, where this Court held that a
plaintiff's pleading that Facebook failed to remove offensive material in a timely manner was
insufficient to qualify Facebook as an information content provider under the CDA, reasoning:

> Nowhere in his complaint or in his opposition brief does the plaintiff allege that the
> defendants contributed to the content of the Facebook page at issue. Rather, as described
> above, the plaintiff focuses on the role that the defendants played in *publishing* the
> Facebook page. The plaintiff's own allegations are inconsistent with a finding that the
> defendants acted as information content providers with respect to the offensive material at
> issue. The Court thus finds that the defendants are not information content providers within
> the meaning of the CDA.

910 F. Supp. 2d at 321. Here, Plaintiffs' boilerplate language that "Defendants . . . actively
participated in . . . each and all of the acts or conduct alleged" in the FAC is inadequate to meet
their burden under the Rule 8 pleading standard. *See Iqbal*, 556 U.S. at 678.

Case 5:21-cv-04024-CJW-MAR   Document 21-1   Filed 04/23/21   Page 27 of 33

online," *Klayman*, 753 F.3d at 1358. Consequently, absent more specific allegations of creation or development of content in the FAC, any alleged posting of a photograph that misappropriated Mr. Griner's likeness would have been done by another information content provider and user of Winred.com; the third prong of the Section 230 inquiry can thus also be answered in the affirmative, entitling WinRed to protection under the CDA.

Because preemption of this D.C. common law tort action against WinRed under the CDA "is evident from the face of the complaint," *Klayman*, 753 F.3d at 1357, WinRed's motion to dismiss the FAC should be granted.

### 4. Because Section 230's intellectual property carveout only extends to federal claims, Plaintiffs' common law misappropriation claim is still barred by the CDA.

Although Section 230 includes a carveout for "any law pertaining to intellectual property," 47 U.S.C. § 230(e)(2), the statutory language and scheme, Congressional intent, and a growing consensus of caselaw demonstrates that this carveout only extends to federal intellectual property claims[11] rather than state claims.

---

[11] Separately, it is not clear that the FAC even raises an intellectual property claim against WinRed. Caselaw is murky regarding whether the tort of misappropriation alleged here by Plaintiffs, *see* FAC ¶ 42, as distinguished from the more specific "right to publicity," qualifies as an intellectual property claim. For instance, as the Eastern District of Wisconsin explained,

> the leading treatise recognizes that the "right to publicity" is really an offshoot of the more general "appropriation" tort. *See* J. Thomas McCarthy, *The Rights of Publicity and Privacy*, § 5.60 (2d ed. 2008). Both torts involve the unpermitted use of an individual's identity, but there are important distinctions between the two torts that are relevant to this case. . . .
>
> [T]he distinction between an appropriation theory and a right to publicity theory is also relevant with respect to CDA immunity. A "right to publicity" claim . . . is generally considered an intellectual property claim, *see Almeida*, 456 F.3d at 1322, which implicates the exception in § 230(e)(2).

*Stayart v. Yahoo! Inc.*, 651 F. Supp. 2d 873, 887-88 (E.D. Wis. 2009). However, even if the FAC states an intellectual property claim, the overwhelming weight of recent caselaw favors limiting

28

First, the language and overall scheme of Section 230 reveals that Congress did not intend for the intellectual property carveout to extend to state-law claims. As the CDA provides, "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." 47 U.S.C. § 230(e)(3). This provision reveals an overarching statutory scheme and purpose of providing sweeping and far-reaching protection to interactive computer service providers from liability not just from federal claims, but also state and local tort claims that could be brought against such defendants. This interpretation is bolstered by the express policy of Section 230 "to preserve the vibrant and competitive free market that presently exists for the Internet . . . unfettered by Federal or State regulation," *id.* § 230(b)(2). Furthermore, in enacting the CDA, Congress stressed that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." *Id.* § 230(a)(3). Considering this express policy, some courts have found that "[h]olding interactive service providers liable for third-party communications would have chilling implications for free speech on the internet." *Saponaro v. Grindr, LLC*, 93 F. Supp. 3d 319, 325 (D.N.J. 2015).

Thus, interpreting the CDA's intellectual property carveout to apply to its fullest extent by allowing liability for state law torts would work against both the statutory scheme and Congressional purpose of granting broad immunity to OSPs from state and local liability. By contrast, a narrower construction of the carveout is consistent with "Congress's expressed goal of insulating the development of the Internet from the various state-law regimes," *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007), and the fact that "[t]he majority of federal circuits have interpreted the CDA to establish broad 'federal immunity to *any* cause of action that

---

Section 230(e)(2)'s carveout to federal intellectual property claims, meaning WinRed is still immune under Section 230 from liability for this common law misappropriation claim.

29

would make service providers liable for information originating with a third-party user of the service,'" *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) (quoting *Zeran*, 129 F.3d at 330).

Additionally, while this Court and this Circuit have not decided the question of whether the CDA preempts *state* intellectual property claims (like the right of publicity), a growing consensus of caselaw demonstrates that this carveout does not extend to state intellectual property laws. The Ninth Circuit has interpreted the term "intellectual property" in subsection (e)(2) to unambiguously mean "federal intellectual property," *CCBill*, 488 F.3d at 1118, reasoning that, "[a]s a practical matter, inclusion of rights protected by state law within the 'intellectual property' exemption would fatally undermine the broad grant of immunity provided by the CDA." *Id.* at 1108. The court also reasoned that, because "state laws protecting 'intellectual property' . . . are by no means uniform" and "[b]ecause material on a website may be viewed across the Internet, and thus in more than one state at a time, permitting the reach of any particular state's definition of intellectual property to dictate the contours of [the CDA] immunity would be contrary to Congress's express goal of insulating the development of the Internet from the various state-law regimes." *Id.* at 1118-19. Besides the Ninth Circuit, no other federal appeals court appears to have squarely decided whether the CDA preempts right of publicity claims. *See, e.g.*, *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 26 n.9 (1st Cir. 2016) (noting the unsettled issue of federal law regarding whether the CDA preempts right of publicity claims, but not taking a position where plaintiffs' claims failed otherwise on the merits); *Almeida*, 456 F.3d at 1323-24 (discussing without deciding the "difficult issues" of whether the CDA applies to a right of publicity claim).

Although this Court has previously expressed skepticism regarding the Ninth Circuit's approach in *CCBill*, it did not ultimately decide the issue because the right of publicity claim was

instead dismissed under the newsworthiness privilege. *See Parisi v. Sinclair*, 774 F. Supp. 2d 310, 317-18 (D.D.C. 2011).[12] However, after *Parisi*, a mounting consensus of caselaw has favored the Ninth Circuit's approach of limiting the carveout to federal intellectual property laws. *See, e.g.*, *Hepp v. Facebook, Inc.*, 465 F. Supp. 3d 491, 501 (E.D. Pa. 2020) ("[T]he Court holds that only federal intellectual property claims are excluded from the scope of CDA immunity, and for this reason, Plaintiff's statutory and common law right of publicity claims are barred by § 230(c) of the CDA"); *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1053 (9th Cir. 2019) ("We have observed before that because Congress did not define the term 'intellectual property law,' it should be construed narrowly to advance the CDA's express policy of providing broad immunity."); *Parker v. Paypal, Inc.*, No. 16-4786, 2017 U.S. Dist. LEXIS 130800, at *16 (E.D. Pa. Aug. 16, 2017) (dismissing plaintiffs' misappropriation of likeness and right to publicity claims as "clearly preempted and prohibited by 230"); *Evans v. Hewlett-Packard Corp.*, No. 13-2477, 2013 U.S. Dist. LEXIS 115856, 2013 WL 4426359, at *3 (N.D. Cal. Aug. 15, 2013) (holding plaintiff's state law right of publicity claim preempted by the CDA); *see also Saponaro*, 93 F. Supp. 3d at 325 ("[T]he CDA manifests a Congressional policy supporting broad immunity."). For the reasons outlined above and in these recent precedents, this Court should do the same. Because the CDA's carveout for intellectual property law does not extend to state law, Plaintiffs' FAC

---

[12] Prior to this Court's determination in *Parisi*, at least two district courts had interpreted Section 230(e)(2) as applying to state intellectual property law, and the First Circuit suggested the same in dicta. *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 703-04 (S.D.N.Y. 2009); *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 299-300 (D.N.H. 2008); *Universal Commc'n Sys., Inc. v. Lycos*, 478 F.3d 413, 422-23 (1st Cir. 2007) (stating in dicta that state law "[c]laims based on intellectual property laws are not subject to Section 230 immunity"); *but see Parker*, 422 F. Supp. 2d at 501 (concluding that because Google is an interactive computer service, "§ 230 affords immunity from suit on claims of invasion of privacy, misappropriation of the right of publicity, defamation, and negligence," and thus Google "cannot be held liable for the claims of . . . invasion of privacy" alleged by plaintiff (citing *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1123 (9th Cir. 2003))).

31

against WinRed should be dismissed.

## CONCLUSION

Plaintiffs fail to demonstrate (1) that WinRed is domiciled in the District of Columbia, (2) that WinRed purposefully directed its alleged tortious conduct toward the District, or (3) that the brunt of the harm allegedly caused by WinRed's contacts with the District was suffered in D.C. Accordingly, this action against WinRed should be dismissed for lack of personal jurisdiction.

Furthermore, because Plaintiffs' allegations only include threadbare, conclusory statements about WinRed's involvement in the alleged appropriation of Sam Griner's likeness, and because this claim is preempted by Section 230 of the CDA in any event, Plaintiffs' FAC against WinRed should be dismissed for failure to state a claim.

Respectfully submitted this 23rd day of April, 2021.

/s/      **Jason Torchinsky**
Jason Torchinsky (D.C. Bar No. 976033)
jtorchinsky@hvjt.law
Jonathan P. Lienhard (D.C. Bar No. 474253)
jlienhard@hvjt.law
HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: (540) 341-8808
Fax: (540) 341-8809
*Counsel for Defendant WinRed, Inc.*

32

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was submitted electronically via the CM/ECF system. This system instantaneously generated a Notice of Electronic Filing which served all counsel of record.

Additionally, on April 23, 2021 a copy of this memorandum of points and authorities in support of Defendant WinRed's motion to dismiss (and supporting documents), along with the motion and proposed order, was served on the following Defendants via U.S. Postal Service First-Class Mail:

**Steven Arnold King**

2210 Rayburn Office Building
Washington, D.C. 20515

and

3897 Esther Ave.
Kiron, IA 51448

**King for Congress**

c/o Steven Arnold King
3897 Esther Ave.
Kiron, IA 51448

and

202 W 2nd St.
PO Box 398
Wall Lake, IA 51466

**/s/_____Jason Torchinsky_____**
Jason Torchinsky (D.C. Bar No. 976033)
jtorchinsky@hvjt.law
Jonathan P. Lienhard (D.C. Bar No. 474253)
jlienhard@hvjt.law
HOLTZMAN VOGEL JOSEFIAK TORCHINSKY PLLC
15405 John Marshall Highway
Haymarket, VA 20169
Phone: (540) 341-8808
Fax: (540) 341-8809

***Counsel for Defendant WinRed, Inc.***

33